**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE:  TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No.  2545<br><br>Master Docket Case No. 1:14-cv-01748<br><br>Honorable Matthew F. Kennelly |
| DANIEL MYERS,<br><br>    Plaintiff,<br><br>vs.<br><br>ABBVIE INC., and<br>ABBOTT LABORATORIES, INC.<br><br>    Defendants. | COMPLAINT AND JURY DEMAND<br><br>Civil Action No.:  15-cv-00737 |

Plaintiff, Daniel Myers, through his undersigned counsel of Peterson & Associates, P.C., hereby alleges as follows:

**<u>INTRODUCTION</u>**

1.     This case involves the prescription drug AndroGel, which is designed, manufactured, sold, distributed and promoted by Defendants AbbVie, Inc. and Abbott Laboratories, Inc. (hereinafter jointly "Defendants" or "AbbVie") as a testosterone replacement therapy.

2.     Defendants misrepresented that AndroGel is a safe and effective treatment for hypogonadism and/or what Defendants describe as "low testosterone," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thromboembolic events.

1

3.        AndroGel is an exogenous form of the androgen testosterone. It regulates the expression of platelet $TXA_2$ receptors in humans, which significantly increases platelet aggregation. It causes an increase in hematocrit and estradiol in adult males, resulting in thickened blood, the development of blood clots, and heart damage. These effects, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, transient ischemic attacks, ischemic stroke, and numerous types of cardiovascular injuries.

4.        AndroGel is delivered transdermally and is applied to the skin in the form of a gel. It is available in either a 1% or 1.62% concentration.

5.        Defendants failed to adequately warn physicians about the risks associated with the AndroGel and the monitoring required to ensure their patients' safety.

6.        Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for AndroGel. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low testosterone" or "Low T," which was ultimately designed to over-promote and sell AndroGel.

7.        According to the industry-leading Androgen Deficiency in Adult Males ("ADAM") or "Is it Low T?" quiz, the symptoms of "Low T" include being "sad or grumpy," "experiencing deterioration in the ability to play sports," and "falling asleep after dinner." Available at: http://www.isitlowt.com/do-you-have-low-t/low-t-quiz. Most doctors agree that these symptoms can be caused by an abundance of factors, the most prominent of which is the natural aging process.

8.      The FDA has not approved any testosterone replacement therapy drug as a treatment for low testosterone or "Low T."   Additionally, low testosterone is not a disease recognized by the medical community. Instead, it is a normal result of the aging process experienced by the majority of males.

9.      As a result of Defendants' "disease mongering," as termed by Dr. Adriene Fugh- Berman of Georgetown University Medical Center, diagnoses of "Low T" have increased exponentially.  This has directly related to AndroGel's sales increasing to over $1.37 billion per year.

10.      However, consumers of AndroGel and their physicians were misled by Defendants as to the drug's safety and efficacy, and as a result many consumers have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.

## PARTIES

### Plaintiff Daniel Myers

11.      Plaintiff Daniel Myers (hereinafter "Plaintiff") is a citizen of the United States of America, and is a resident of Cannon County, Tennessee.

12.      In May 2011, Plaintiff began using the prescription drug AndroGel 1%.

13.      On or about December 3, 2011, while using AndroGel 1%, Plaintiff was diagnosed with bilateral pulmonary emboli.

14.      On or about December 13, 2011, while using AndroGel 1%, Plaintiff was diagnosed with a cerebrovascular accident or transient ischemic attack.

15.      Plaintiff's bilateral pulmonary emboli and cerebrovascular accident or transient ischemic attack were caused by his use of AndroGel 1%.

3

## Defendants AbbVie, Inc. and Abbott Laboratories, Inc.

16.     Defendant AbbVie Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

17.     Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.

18.     By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought FDA approval in 1999. Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals, Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market. In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's pharmaceutical division, which included AndroGel.

19.     Subsequently, in October of 2011, Abbott Laboratories, Inc. decided to split its company into two leading companies: a researched-based pharmaceutical company and a medical products based company. As such, Abbott Laboratories, Inc. created AbbVie, Inc. to be the company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel. AbbVie, Inc. was incorporated on April 10, 2012 and began operations as the owner and operator of Abbott Laboratories, Inc.'s proprietary pharmaceutical business in January of 2013.

20.     Abbott Laboratories, Inc. assumed the liability of Solvay's pharmaceutical division, which included AndroGel. AbbVie, Inc. is merely a continuation of Abbott Laboratories, Inc.'s pharmaceutical business and assumed the liability of Abbott Laboratories, Inc. as it pertains to the defective and dangerous nature of AndroGel, and injuries and damages caused by the use of AndroGel, under Illinois' successor liability law.

4

21.     At all times herein mentioned, Defendants advertised, promoted, supplied, and sold to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public a certain pharmaceutical product, AndroGel, in this judicial district, in the State of Tennessee, and in interstate commerce.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C.§ 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy between Plaintiff and Defendants exceeds $75,000.00, exclusive of interest and costs.

23.     Plaintiff is filing this Complaint directly in MDL No. 2545 by agreement of the Parties and as permitted by Case Management Order No. 12 issued by Judge Matthew F. Kennelly of this Court.  Plaintiff states that but for CMO No. 12 allowing direct filing in MDL No. 2545, Plaintiff would have filed this action in the United States District Court for the Middle District of Tennessee, which is the venue in which Plaintiff resides.

24.     Venue is proper in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) and 1391(c)(2), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Middle District of Tennessee, because the Middle District of Tennessee is the judicial district in which Plaintiff resides, and because Defendants are entities who are subject to the personal jurisdiction of Tennessee courts with respect to the civil action in question.

25.     Therefore, Plaintiff respectfully requests that, at the time of remand and transfer of this action back to the trial court for further proceedings, this case be retained in this Court in the Middle District of Tennessee pursuant to Case Management Order No. 12.

## FACTUAL BACKGROUND

### General Allegations

26.     This action is for damages brought on behalf of Plaintiff Daniel Myers who was prescribed and supplied with, received and who has taken and applied, the prescription drug AndroGel, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by this drug.

27.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

28.     At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug AndroGel for the use and application by men, including, but not limited to, Plaintiff.

29.     At all times herein mentioned, Defendants were authorized to do business within the state of residence of Plaintiff, within the state in which Plaintiff's injuries arose, and within the State of Tennessee.

30.     At all times herein mentioned,  the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the

hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

## Regulatory History and Approved Uses

31.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

32.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

33.     In men, testosterone levels normally begin a gradual decline after the age of thirty.

34.     The average testosterone levels for most men range from 300 to 1,000 ng/dl of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who may have testosterone levels below 300 ng/dL on one day will have normal testosterone levels the next. Additionally, testosterone levels gradually decline as men age.  This decline in serum testosterone levels is a normal process that does not represent a medical condition or disease.

35.     The Food and Drug Administration approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone (a condition called Hypogonadism) in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.  (AndroGel 1.62% was approved in April 2011). After FDA approval, AndroGel was widely advertised and marketed by Defendant as a safe and effective testosterone replacement therapy.

36.    Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the severely diminished production or nonproduction of testosterone. Primary hypogonadism occurs under circumstances of congenital or acquired pathologic insults to and conditions of the testes in men.  Secondary hypogonadism occurs under the circumstances of hypogonadotropism, including hypothalamic-pituitary diseases and disorders and other conditions which cause suppression of gonadotropin-releasing hormone (GnRH).

37.    In 1999, when Unimed Pharmaceuticals Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."  The company represented to the FDA that it would market and sell the drug to this patient population of one million men who have an actual diagnosis of hypogonadism with associated medical condition.   This was a false representation that the company made to the FDA in order to obtain approval of the drug. Defendants had adopted and continue to promote this false representation.

38.    In 2000, when the FDA approved AndroGel, the company announced that the market had increased from one million men to "four to five million American men." By 2003, the number again increased to "up to 20 million men."  However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism.  For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

39.     Additionally, a Canadian study showed that only about 6.3% of men who were prescribed testosterone actually met the diagnostic criteria for hypogonadism.

40.     At all times material hereto, and since the time that AndroGel first received approval from the FDA, Defendants knew and understood the FDA-approved indications for clinical use of the AndroGel product.

### Direct to Consumer Marketing and Promotion to Physicians for Unbranded/Off-Label Use

41.     Defendants expanded the indications for use by promoting and detailing "Low T" as an acquired form of hypogonadism and advantaged intentional ambiguity in the AndroGel product labeling as a basis for "label expansion" and "off-label" marketing, detailing, and promotion to physicians.

42.     In 2000, when reviewing the drug's advertisements, the FDA told AndroGel's maker that "claims and representation that suggest that AndroGel is indicated for men with 'age- associated' hypogonadism or 'andropause' are misleading." The drug, the FDA said, was only approved for men with hypogonadism.  Despite this admonition from the FDA, the Defendants continued to market and promote testosterone replacement therapy for "andropause" and "Low T."

43.     Defendants coordinated a massive advertising campaign targeted toward men who did not have Hypogonadism, nor had low or no testosterone in conjunction with an associated medical condition.  The direct to consumer marketing was designed to convince men that they suffered from a non-existent and unrecognized medical condition called "Low T," which was a term for low testosterone.  Defendants orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in

healthcare providers' offices and distributed to potential AndroGel users, and online media including the unbranded website "IsItLowT.com."

44.     The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

45.     Defendants' national education campaign included the creation and continued operation of the website www.IsItLowT.com.   The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "take the 'Is it Low T' Quiz."   The "Is it Low T" quiz asks men if they have experienced potential signs of low testosterone, including, "Have you experienced a recent deterioration in your ability to play sports?", "Are you falling asleep after dinner?", "Are you sad and/or grumpy?", and "Do you have a lack of energy?"

46.     Dr.  John Morley, director of endocrinology and  geriatrics at the  St. Louis University School of Medicine, developed this quiz at the behest of Dutch pharmaceutical company  Organon  BioSciences,  in  exchange  for  a  $40,000  grant  to  his  university.     The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy."   Dr. Morley drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper and giving them to his secretary the next day to type up.  Dr. Morley admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal."  This is

the "Low T Quiz" used on the "IsItLowT" website.   Natasha Singer, *Selling that New-Man Feeling*, Nov. 23, 2013 N.Y. TIMES.

47.     Since the FDA approved AndroGel for a very specific medical condition called Hypogonadism, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

48.     While running this disease awareness campaign, Defendants promote their product AndroGel as an easy to use topical testosterone replacement therapy. Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

49.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

50.     Defendants manufactured, sold and promoted the drug to treat a non-existent medical condition that it called "LowT," which was a name it created for the constellation of symptoms experienced by men as a result of the normal aging process.   In essence, Defendants marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

51.     Upon information and belief, a 2004 memo on AndroGel sales strategies said the sales force was putting extra emphasis on rural areas, since "rural doctors are typically

11

very accessible, give us plenty of time to teach them the right way to diagnose and treat, and they have the patients."

52.     Defendants successfully created a robust and previously nonexistent market for their drug.  Defendants spent $80 million promoting AndroGel in 2012. The company also spent millions on its unbranded marketing including commercials and its websites, www.IsItLowT.com and www.DriveForFive.com, sites that recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

53.     As observed by Lisa M. Schwartz, M.D., M.S. and Steven Woloshin, M.D., M.S. in their article "Low T as a Template: How to Sell Disease" published in JAMA  Internal Medicine 173(15):1460-1462 (August 12/26, 2013) concerning the "Low T" campaigns by the pharmaceutical industry:

> Whether the campaign is motivated by a sincere desire to help men or simply by greed, we should recognize it for what it is: a mass, uncontrolled experiment that invites men to expose themselves to the harms of a treatment unlikely to fix problems that may be wholly unrelated to testosterone levels.
>
> We agree with Braun that there is a strong analogy between the marketing of testosterone therapy for men and estrogen therapy for menopausal women. Ignoring the lessons of estrogen therapy is scandalous. Before anyone makes millions of men aware of Low T, they should be required to do a large-scale randomized trial to demonstrate that testosterone therapy for healthy aging men does more good than harm.

54.     Defendants' advertising paid off in a return of $1.4 billion in sales during the year 2013, making AndroGel the biggest selling androgen drug in the United States. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts.  Shannon Pettypiece, *Are*

*Testosterone Drugs the Next Viagra?*, May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

55.     In 2009, a whistle-blower lawsuit filed by Relator John King and Jane Doe on behalf of the United States and 23 individual states alleged that AndroGel was marketed and promoted for off-label uses, including osteoporosis, sexual dysfunction, depression, and obesity.

56.     In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance Low T. *See* Singer, *Selling That New-Man Feeling*, *supra*; See *also*, Larry Dobrow, *All-star large pharma marketing team of the year: Androgel.*  Jan. 2, 2013, Medical Marketing & Media, *available at:* http://www.mmm-online.com/all-star-large-pharma-marketing-team-of-the-year-androgel/article/273242/.

57.     Defendants engaged in aggressive promotion to physicians that testosterone replacement therapy could be used as a lifestyle drug to treat conditions such as erectile dysfunction.  Sales representatives were instructed to tell physicians that if a patient requested medication for erectile dysfunction the physician should first test the patient's testosterone level to determine if the cause of the erectile dysfunction was "Low T."

58.     The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States, and that the use of AndroGel is safe for human use as a treatment for "Low T," even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

59.     Upon information and belief, at all times material hereto, Defendants'
marketing strategy included the use of sales or drug detailing representatives ("Reps") and
marketing and brand team personnel who performed on-line and in-person AndroGel product
detailing to physicians; and also promotional and detailing to healthcare providers and
physicians at medical organization and society meetings and conventions via display booths,
sponsored meeting sessions and "satellite" sessions, and sponsored medical speakers.

60.     Defendants' drug detailing "reps" provided physicians and healthcare
providers with information and literature concerning the indications for clinical use of the
AndroGel product, as well as discount and/or rebate coupons to give to patients for the purchase
of AndroGel.

61.     Defendants' drug "reps" detailed and marketed AndroGel to physicians
as a product approved and indicated for the treatment of age-related declines in testosterone
levels and age-related symptoms.

62.     Defendants denominated and characterized age-related declines in
testosterone levels and age-related symptoms in men as "Low T" and used the "Low T" moniker
to denote and connote that the presence of age-related declines in testosterone levels and age-
related symptoms in men were a form of acquired hypogonadism.

63.     The Defendants knew and understood the meaning of the terms "off-
label" and "label expansion."

64.     The Defendants knew and understood the FDA regulations pertaining
to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

65.     Defendants marketed, promoted, and detailed AndroGel for "off-label" use
for the purpose of "label expansion," and detailed and promoted the product to physicians,

14

and advertised the product to consumers and patients, under the rubric that "Low T" was an indication for clinical use of the AndroGel product.

66.     A manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an "off-label" purpose.

67.     A manufacturer misbrands a drug if the labeling, or any of the manufacturer's promotional and advertising materials, describe an intended use for the drug that has not been approved by the FDA.

68.     Promotional materials are misleading if they suggest that a drug is useful in the treatment of a broader range of conditions, or in a broader population of patients, than has been demonstrated by substantial evidence or substantial clinical experience.

69.     Promotional materials are misleading if they represent or suggest that a drug is more effective than has been demonstrated by substantial evidence or substantial clinical experience.

70.     Promotional materials are misleading if they fail to reveal facts that are material in light of the representations made, or with respect to the consequences that may result from the use of the drug as recommended or suggested by the materials.

71.     The FDA did not, and never has, approved AndroGel for the treatment of:

    a.      age-related declines in testosterone levels in men;

    b.      age-related symptoms;

    c.      mood disorders, including depression or "grumpiness" or inability to concentrate;

    d.      lack of sexual interest or decreased libido;

    e.      disorders of erectile function or erectile dysfunction;

15

      f.      loss of muscle mass; or,

      g.      bone strength or density abnormalities.

<u>**Adverse Events and Serious Health Risks**</u>
<u>**Caused by Testosterone Replacement Therapy ("TRT")**</u>

72.      There have been a number of recent studies associating testosterone use in men with an increased risk of serious injuries from blood clots and cardiovascular events.

73.      Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the application of a cream, gel or patch directly to the skin for transdermal absorption into the body. It can also be delivered into the body by subcutaneous injection or placement of a time-released pellet containing the drug.

74.      The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and it also results in an increase in hematocrit[1] and serum estradiol levels.[2] It can also cause increased platelet aggregation and vasoconstriction.

75.      Hematocrit is the proportion of total blood volume that is comprised of red blood cells. Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (like Testosterone). When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count. The range for normal hematocrit levels in adult males is 44%-48%.

---

[1] Fernandez-Balsells, M., et al., Adverse Effects of Testosterone Therapy in Adult Men: A Systematic Review and Meta-Analysis. J Clin Endocrinol Metab, June 2010, 95(6):2560–2575.
[2] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

76.     The administration of exogenous testosterone causes a 7%-10% increase in hematocrit levels in adult males through the process of erythrocytosis.[3] An increase of hematocrit that is 7%-10% above normal range is a significant elevation and qualifies as polycythemia. This is a serious medical condition that requires treatment to prevent injury.

77.     Upon information and belief, the clinical trial data submitted to the FDA for the approval of AndroGel showed that the use of exogenous testosterone resulted in nine percent of subjects experiencing hematocrit levels greater than 56% at some point during the study. A hematocrit level of 56% is significantly elevated above the normal range and qualifies as polycythemia. This is a level that puts the patient at serious risk for an adverse health consequence and requires immediate treatment and/or cessation of the testosterone therapy.

78.     Elevated hematocrit is an independent risk factor for stroke and it interacts synergistically with elevated blood pressure. In a published study,[4] the cohort for men with a hematocrit level greater than or equal to 51% had a more than doubling of the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive there was a nine-fold increase in the risk of stroke for those with hematocrit greater than or equal to 51%.

79.     Elevated hematocrit is also an independent risk factor for adverse cardiovascular events. Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure. In 3,523 Framingham participants, aged 50-65, who were free of a history of heart

---

[3] Bachman, E., et al. Testosterone Induces Erythrocytosis via Increased Erythropoietin and Suppressed Hepcidin: Evidence for a New Erythropoietin/Hemoglobin Set Point. J Gerontol A Biol Sci Med Sci., 2013.
[4] Wannamethee G1, Perry IJ, Shaper AG, Hematocrit, hypertension and risk of stroke. J Intern Med. 1994 Feb;235(2):163-8.

failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or equal to 50% had almost double the risk of new-onset heart failure during follow-up, compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.[5]

80.     In another study of 670 males conducted over 28 years in Finland, the  data showed that men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to die from coronary heart disease than men with hematocrit levels of less than 50%. Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.[6]

81.     In yet another large, prospective study[7] in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit. In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to  men  whose hematocrit was in the lower 40th percentile.

82.     An increase in the level of hematocrit also causes an increase in the viscosity of the blood. A 10.99% increase of hematocrit produces an increase of 1 unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual.[8] An increase in blood viscosity is a known risk factor for ischemic heart disease,[9]

---

[5] Coglianese, E., et al., Usefulness of the Blood Hematocrit Level to Predict Development of Heart Failure in a Community. Am J Cardiol. Jan 15, 2012; 109(2): 241–245. Published online Oct 12, 2011
[6] Kunnas, T, et al., Hematocrit and the risk of coronary heart disease mortality in the TAMRISK study, a 28-year follow-up. Prev. Med. Volume 49, Issue 1, July 2009, Pages 45–47.
[7] Braekkan SK, Mathiesen EB,et al., Hematocrit and risk of venous thromboembolism in a general population. The Tromso study. Haematologica. 2010 Feb; 95(2):270-5.
[8] Cinar, Y., et al., Effect of hematocrit on blood pressure via hyperviscosity. Am J Hypertens. 1999 Jul;12(7):739-43.
[9] Yarnell, JW, et al., Fibrinogen, viscosity, and white blood cell count are major risk factors for ischemic heart disease. The Caerphilly and Speedwell collaborative heart disease studies. Circulation. 1991 Mar;83(3):836-44

and it can cause hypertension as blood pressure increase will be 20% or vasodilation will be 4.66% in radius for the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke. Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

83. The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol. When men are given testosterone, either by application of an androgen gel or by injection, some of that testosterone is converted by the body (aromatized) to estradiol.[10] The increase of estradiol is in direct relation to the amount of the dose of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.[11]

84. In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991-1993, and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower.[12] This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles. Atrial fibrillation is a known cause of thrombus formation.

85. If men have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation high, Factor VIII, high homocysteine, or the lupus anticoagulant, then the

---

[10] Glueck, CJ, et al., Thrombotic events after starting exogenous testosterone in men with previously undiagnosed familial thrombophilia. Trans. Res. Oct. 2011.
[11] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.
[12] Abbott, RD, et al., Serum Estradiol and Risk of Stroke in Elderly Men. Neurology 2007, 68:563-568.

estradiol can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones.[13]

86.     In a study published in 2006, blood levels of estradiol were measured in 313 men whose average age was 58. Carotid artery intima-media thickness was measured at baseline and then three years later. After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall. This led the researchers to conclude, "circulating estradiol is a predictor of progression of carotid artery intima-media thickness in middle-aged men."[14] These findings of a positive association between serum estradiol levels and intima-media thickening supports the notion that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis (the formation of atheromas or plaque in the arterial walls) in men.

87.     In a case control study of men in the Framingham cohort *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.[15]

88.     Estradiol has a greater effect in the male heart through the regulation of gene expression that it does in female hearts. This effect results in impaired contractile function of the heart in males with elevated levels of serum estradiol.[16] Impaired contractile function results in numerous cardiovascular injuries and disease.

89.     A study published in 2007 compared blood levels of testosterone and estradiol in men suffering acute myocardial infarction (heart attack) with those who had

---

[13] Glueck, CJ, et al., Testosterone, thrombophilia, thrombosis. Blood Coagulation and Fibrinolysis 2014, 25:00–00
[14] Tivesten, A., et al., Circulating Estradiol is an Independent Predictor of Progression of Carotid Artery Intima-Media Thickness in Middle-Aged Men, J CLIN ENDOCRINOL METAB, November 2006, 91 (11): 4433-4437.
[15] Phillips GB, Castelli WP, Abbott RD, et al., Association of Hyperestrogenemia and Coronary Heart Disease in Men in the Framingham Cohort, Am J Med, 1983 74:863-869.
[16] Kararigas, G., et al., Transcriptome Characterization of Estrogen-Treated Human Myocardium Identifies Myosin Regulatory Light Chain Interacting Protein as a Sex-Specific Element Influencing Contractile Function, JACC Vol. 59, No. 4, January 24, 2012, 2012:410-7.

previously suffered a heart attack. Sex hormones were measured in patients presenting with acute heart attack, patients with old heart attack, and patients with normal coronary arteries. The results showed significantly higher levels of estradiol in both groups of heart attack patients compared to those without coronary disease.[17]  In another study, men were admitted to the hospital with acute heart attacks whose levels of sex hormones were evaluated. Compared with control patients, estradiol levels in these heart attack patients were 180% higher, while bioavailable testosterone levels were nearly three times less than those of control patients.[18]

90.     High testosterone levels also enhance acute myocardial inflammation, adversely affecting myocardial healing and early remodeling, as indicated by increased cardiac rupture, and possibly causing deterioration of cardiac function after myocardial infarction ("MI"), and, conversely, estrogen seems to have no significant protective effect in the acute phase after MI.[19]

91.     Thromboxane A2 (TXA2) is a vasoconstrictor and platelet pro-aggregatory agent that has been implicated in the pathogenesis of cardiovascular disease.  Thromboxane A2 has been unequivocally implicated in a range of cardiovascular diseases, owing to its acute and chronic effects in promoting platelet aggregation, vasoconstriction and proliferation.   A study published in 1995 demonstrated that testosterone treatment was associated with a significant increase in the maximum platelet aggregation response and this effect may contribute to the thrombogenicity of androgenic steroids like testosterone.[20]

---

[17] Mohamad MJ, Mohammad MA, Karayyem M, Hairi A, Hader AA. Serum levels of sex hormones in men with acute myocardial infarction. Neuro Endocrinol Lett. 2007 Apr;28(2):182-6.

[18] Pugh PJ, Channer KS, Parry H, Downes T, Jone TH. Bio-available testosterone levels fall acutely following myocardial infarction in men: association with fibrinolytic factors. Endocr Res. 2002 Aug;28(3):161-73.

[19] Maria A. Cavasin , Zhen-Yin Tao , Ai-Li Yu , Xiao-Ping Yang; American Journal of Physiology - Heart and Circulatory Physiology Published 1 May 2006Vol. 290no. H2043-H2050DOI: 10.1152/ajpheart.01121.2005

[20] Ajayi, A., et al., Testosterone Increases Human Platelet Thromboxane A2 Receptor Density and Aggregation Responses. Circulation. 1995; 91: 2742-2747.

92.      In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

93.      In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels," in which a large cohort of men who used testosterone taken from a database of the Veteran's Administration was compared against a cohort of men who did not use testosterone.   The data showed that among the cohort who used testosterone, the testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

94.      On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty-five years old and in men younger than sixty-five with a comorbid condition.   The conclusion of this published study was that the risk of myocardial infarction following initiation of testosterone therapy prescription is substantially increased.

95.      In a study published in 2013[21], based on a systematic review and meta-analysis of placebo-controlled randomized trials of testosterone therapy among men lasting twelve or more weeks reporting cardiovascular-related events, two reviewers independently searched, selected and assessed study quality with differences resolved by consensus. Additionally, two statisticians independently abstracted and analyzed data, and concluded that testosterone therapy increased the risk of a cardiovascular-related event. Their meta-analysis of

---

[21] Xu, L., et al. Testosterone therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials, BMC Medicine 2013, 11:108.

the published literature also showed that the effect of testosterone therapy varied with source of funding. In trials not funded by the pharmaceutical industry the risk of a cardiovascular-related event on testosterone therapy was greater than in pharmaceutical industry funded trials. The study concluded that the existing body of published medical literature demonstrates that in trials not funded by the pharmaceutical industry, exogenous testosterone increased the risk of cardiovascular-related events, with corresponding implications for the use of testosterone therapy.

## **Inadequate Warnings and Labeling**

96.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users and their physicians about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

97.     Defendants successfully marketed AndroGel by undertaking a  "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low T."

98.     AbbVie's advertising program, sought to create the image and belief  by consumers that the use of AndroGel was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew  or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

99.     Defendants promoted and marketed testosterone replacement therapy   to physicians as a lifestyle drug that could treat a variety of symptoms caused by the

normal aging process in males, including: erectile dysfunction; loss of libido; loss of athleticism; loss of muscle mass; fatigue; and mood swings. Defendants overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

100.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using AndroGel. Upon information and belief, Defendants deceived potential AndroGel users and their physicians by relaying positive information through the press, including "AndroGelonials" from retired professional athletes, and manipulating the definition of hypogonadism and statistics of its occurrence in men to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

101.     Defendants concealed material relevant information from potential AndroGel users and their physicians, and minimized user and prescriber concern regarding the safety of AndroGel, including but not limited to its known propensity to drastically increase hematocrit and estradiol in users.

102.     In particular, in the warnings Defendants provided in their commercials, online and print advertisements, Defendants failed to mention any potential risk of cardiac event, stroke, pulmonary embolism or other dangerous side effects related to blood clotting and falsely represent that AbbVie adequately tested AndroGel for all likely side effects. The Defendants also failed to warn and instruct regarding the importance of adequate monitoring of hematocrit and estradiol levels.

103.     At the time Plaintiff used AndroGel and suffered his injuries described herein, AndroGel's prescribing information and medication guide contained within the package materials did not warn against stroke, pulmonary embolism, transient ischemic attack,

24

cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

104.    The medication guide contained within the package materials instructed patients to tell their healthcare provider whether they have any of the following conditions before initiating use of AndroGel:

- have breast cancer

- have or might have prostate cancer

- have urinary problems due to an enlarged prostate

- have heart problems

- have kidney or liver problems

- have problems breathing while you sleep (sleep apnea)

- have any other medical conditions

However, the prescribing information and medication guide contained within the package materials failed to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant. They also failed to instruct patients or physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of 65 who use testosterone therapy.

105.    Although the prescribing information and medication guide contained within the package materials warned that the use of the product may result in increased red blood cell count, they did not instruct physicians or patients that the product can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism,

25

ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count did not warn patients and their physicians that hematocrit levels can rise by as much as 10% above normal range, nor did it warn of the serious and life threatening risks that are associated with a red blood cell count that exceeds 50%, including the fact that individuals with a hematocrit greater than or equal to 51% have a doubling of the risk of stroke, new-onset heart failure, and coronary heart disease.

106.    Although the prescribing information and medication guide contained within the package materials instructed physicians to re-evaluate their patient's hematocrit 3 to 6 months after starting treatment, they failed to warn patients and their physicians that the product can cause dangerous increases in hematocrit much more rapidly, and also failed to instruct physicians to monitor their patient's hematocrit more frequently.

107.    The prescribing information and medication guide contained within the package materials failed to state that testosterone replacement therapy should not be administered to men who have an underlying inherited trait which increases their risk of blood clotting, such as the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, because the increase in serum estradiol caused by the drug can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones. They also fail to instruct physicians to screen all patients for underlying clotting traits before prescribing testosterone replacement therapy.

108.    Although the prescribing information and medication guide contained within the package materials warned that use of the product may result in risk of blood clots in the veins, they specifically limit this warning to "blood clots in the legs" and only warn against blood clots in the legs that form as a result of increased red blood cell count (polycythemia).

26

There is no warning for blood clots in the veins other than "blood clots in the legs," nor is there any warning of blood clots resulting from causes other than polycythemia. Also, there are no warnings that blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

109.    The prescribing information and medication guide contained within the package materials failed to warn that use of the product may result in elevated levels of estradiol. They did not instruct physicians to monitor estradiol levels, nor did they provide any guidance to physicians or patients regarding the significant health risks associated with elevated levels of serum estradiol in men, including the fact that there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower, and that estradiol blood levels greater than 34.1 pg/mL resulted in more than doubling of stroke incidence in men. There was also no warning that elevated serum estradiol levels resulting from use of the product can cause impairment of contractility of the heart.

110.    The prescribing information and medication guide contained within the package materials did not warn that use of the product may result in the formation of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction caused by elevated levels of estradiol.

111.    The prescribing information and medication guide contained within the package materials did not offer any warning of the very serious health risks for men over the age of 65 who use testosterone replacement therapy. There was no mention of the fact that there is a doubling of the risk of heart attacks in men over the age of 65 who use testosterone replacement therapy, despite the fact that the data supporting this finding has been available for years.

Instead, the label only stated that the manufacturer lacks any information regarding the safety or efficacy of testosterone therapy for men over the age of 65. This absence of a warning failed to adequately advise and instruct patients and their physicians of the very serious health risks caused by the use of testosterone in this patient population.

112.     In November of 2013, Rebecca Vigen, Colin I. O'Donnell, Anna E. Barón, Gary K. Grunwald, et al. published as article in the Journal of the American Medical Association entitled Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels ("Vigen Paper").

113.     The Vigen Paper concluded that: "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke."   In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

114.     On January 29, 2014, William D. Finkle, Sander Greenland, Gregory K. Ridgeway John L. Adams, et al. published an article in PLOS ONE entitled Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men ("Finkle Paper").

115.     The Finkle Paper demonstrated an increased risk of heart attack in men over age 65 years, and in men younger than 65 years with a prior history of heart disease.

116.     The increased incidence of heart attack and stroke was foreseeable at the time of the product launch of AndroGel 1% and 1.62%.

117.     Other studies and additional medical evidence, as described herein, indicate that the use of testosterone increases the risk of thromboembolic events, such as

deep vein thrombosis ("DVT"), pulmonary embolism ("PE"), venous sinus thrombosis ("VST"), and other thrombotic events.

118.      On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the FDA announced that it was requiring manufacturers of testosterone to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism ("VTE"), including deep vein thrombosis ("DVT") *and* pulmonary embolism ("PE").

119.      As a result of this mandate by the FDA, on June 19, 2014, the Defendants updated the prescribing information to provide the general warning required by FDA regarding DVT and PE, and also updated the medication guide for AndroGel to include the significant risk of PE as follows: "Blood clots in the legs or lungs. Signs and symptoms of a blood clot in your leg can include leg pain, swelling, or redness. Signs and symptoms of a blood clot in your lungs can include difficulty breathing or chest pain."

120.      However, the prescribing information and the medication guide contained within the package materials still lacks any warning about the risks of elevated estradiol levels and the need to screen for underlying clotting traits, and they contain no warnings for strokes, or for cardiovascular injuries.

121.      The marketing and promotion of the product to patients and physicians overstated its benefits by creating the impression that it was a safe and effective treatment for a variety of aging-related conditions and symptoms, for which it was not FDA approved. This is misleading and fails to adequately warn physicians and patients about the numerous, life-threatening health risks associated with use of the drug.

29

122.     As a result of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively sought out prescriptions for AndroGel.

123.     Had Plaintiff and his physician(s) known about the risks and dangers associated with AndroGel, as described herein, Plaintiff's physician(s) would not have prescribed nor would Plaintiff have used AndroGel. Consequently, Plaintiff would not have been subject to its serious side effects, and/or Plaintiff's physician(s) would have adequately monitored Plaintiff's hematocrit and estradiol levels, and, as a result, Plaintiff's injuries would have not have occurred.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF

124.     In May 2011, Plaintiff was prescribed and began using the prescription drug AndroGel 1%.

125.     On or about December 3, 2011, while using AndroGel 1%, Plaintiff was diagnosed with bilateral pulmonary emboli.

126.     On or about December 13, 2011, while using AndroGel 1%, Plaintiff was diagnosed with a cerebrovascular accident or transient ischemic attack.

127.     Plaintiff's bilateral pulmonary emboli and cerebrovascular accident or transient ischemic attack were caused by his use of AndroGel 1%.

128.     Plaintiff was 56 years of age when he was prescribed and began using AndroGel.

129.     As a direct and proximate result of using AndroGel, Plaintiff Daniel Myers suffered the injuries described above.

130.     Prior to and at the time of Plaintiff's use of AndroGel, Defendants knew or should have known that the use of AndroGel created a significantly increased risk of serious

personal injury, including stroke, heart attack, blood clots, and even death, and that such use was unreasonably dangerous to consumers such as Plaintiff.

131.    Despite the fact that Defendants knew or should have known of the serious health risks associated with the use of AndroGel, Defendants failed to adequately warn Plaintiff Daniel Myers and/or his health care providers of these risks before he used the product.

132.    Had Defendants properly disclosed the risks associated with AndroGel and other testosterone products, Plaintiff Daniel Myers would have avoided the risk of pulmonary emboli, stroke or transient ischemic attack and other injuries by either not using AndroGel and/or testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

133.    As a direct and proximate result of Plaintiff's use of AndroGel, Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff Daniel Myers suffered severe and permanent physical and emotional injuries, including, but not limited to, pulmonary emboli, stroke or transient ischemic attack, which may have caused permanent effects, and may continue in the future to cause him physical effects and damages which will affect him throughout his lifetime.

134.    Further, as a direct and proximate result of Plaintiff's use of AndroGel, Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff has suffered significant mental anguish and emotional distress and will continue to suffer physical limitations, pain, injury, damages, harm, and mental and emotional distress in the future.

135.    Plaintiff has also suffered economic loss, including incurring significant expenses for medical care and treatment, and will continue to incur such expenses in the future,

as a direct and proximate result of his use of AndroGel and Defendants' conduct as described herein.

136.     As a direct and proximate result of using AndroGel, Plaintiff suffered the injuries described above.

137.     Prior to Plaintiff's use of AndroGel, Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

138.     Therefore, at the time Plaintiff used AndroGel, Defendants knew or should have known that the use of AndroGel increased the risk to consumers of serious personal injury, including life-threatening cardiac and thrombotic events.

139.     Despite the fact that Defendants knew or should have known of the serious health risks associated with the use of AndroGel, Defendants failed to adequately warn Plaintiff and/or his health care providers of said serious risks before he used the product.

140.     Had Plaintiff and/or his health care providers known of the increased risks and dangers associated with AndroGel, he would not have used the product and Plaintiff would not have suffered severe physical, emotional and personal injuries.

141.     Despite diligent investigation by Plaintiff, the nature of Plaintiff's injuries and damages, and their relationship to AndroGel was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

142.     As a direct and proximate result of his use of AndroGel, Plaintiff has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment, including, but not limited to, the injuries suffered by Plaintiff, which may have caused permanent

32

effects, and which may continue in the future to cause him physical effects and damage which will affect him throughout his lifetime.

143.     Further, as a direct and proximate result of his use of AndroGel, Plaintiff has suffered significant mental anguish and emotional distress and will continue to suffer physical limitations, pain, injury, damages, harm and mental and emotional distress in the future.

144.     Plaintiff has also incurred medical expense and other economic harm and will continue to incur such expenses in the future, as a direct and proximate result of his use of AndroGel.

## CAUSES OF ACTION

## Count One – Strict Products Liability – Failure to Warn

145.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

146.     The Defendants are liable under the theory of product liability as set forth in §§ 402A and 402B of the Restatement (Second) of Torts.

147.     The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions; Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

148.     Defendants failed to adequately warn consumers and/or their health care providers that AndroGel causes increased hematocrit levels that lead to life-threatening outcomes like heart attack and stroke.

149.     Defendants failed to adequately warn consumers and/or their health care providers that a patient taking AndroGel should frequently monitor hematocrit levels to prevent life-threatening cardiac and/or thrombolytic events.

150.     The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions, because after Defendants knew or should have known of the risk of serious bodily harm from the use of AndroGel, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

151.     As a direct and proximate result of Plaintiff's reasonably anticipated use of AndroGel as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses in the future.

**Count Two – Strict Products Liability – Defect in Design or Formulation**

152.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

153.     Defendants are manufacturers, designers, distributors, sellers or suppliers of AndroGel.

154.     The AndroGel manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants was defective in its design such that it was unreasonably dangerous, was not fit for the ordinary purposed for which it was intended and/or did not meet the reasonable expectations for an ordinary consumer.

155.     The AndroGel manufactured and supplied by Defendants was defective in design or formulation that, when it left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an

ordinary consumer would expect.

156. The foreseeable risks associated with the design or formulation of the AndroGel, include, but are not limited to, the fact that the design or formulation of AndroGel is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonable foreseeable manner.

157. At the time Defendants manufactured, designed, distributed, sold, and/or supplied AndroGel into the stream of commerce, a safer, more practical, alternative design was available.

158. The AndroGel manufactured, designed, sold, distributed, supplied, and/or placed in the stream of commerce by Defendants, was defective in design as described above at the time it left the Defendants' control and said product was expected to and did reach the consumer without any alterations or changes.

159. As a direct and proximate result of Plaintiff's use of AndroGel as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants, Plaintiff suffered personal injury, economic and non-economic damages, and will continue to suffer such harm, damages, and economic loss in the future.

160. Defendants' acts or omissions as alleged in this Complaint demonstrate that Defendants acted willfully, maliciously, with intentional fraudulent conduct, or with conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others so as to warrant the imposition of punitive damages.

### Count Three – Negligence

161. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

162. At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research,

distribute, market, label, package, distribute, prepare for use, sell, prescribe, and adequately warn of the risks and dangers of AndroGel.

163.    At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use, and sold AndroGel, and they failed to adequately test and warn of the risks and dangers of AndroGel.

164.    Despite the fact that Defendants knew or should have known that AndroGel caused unreasonable and dangerous side effects, Defendants continued to market AndroGel to consumers including Plaintiff, when there were safer alternative methods and/or no need to treat conditions such as loss of energy decreased libido, erectile dysfunction, depression, moodiness, and other conditions that AndroGel marketing materials claim are caused by "Low T."

165.    Defendants knew or should have known that consumers, such as Plaintiff, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

166.    Defendants' negligence was a proximate cause of the Plaintiff's injuries, harm, and economic loss as described herein.

### Count Four – Gross Negligence

167.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

168.    Defendants owed Plaintiff and all consumers a duty of reasonable care in the manner they designed, manufactured, and tested AndroGel, and warned of AndroGel's dangers.

36

169.     Defendants breached their duty of care by designing, manufacturing, testing, and labeling AndroGel in a manner that was dangerous to those who used it.

170.     A reasonable manufacturer would or should have known that AndroGel's risks are unreasonably greater than necessary and/or than other similar products.

171.     Defendants consciously and voluntarily disregarded the risks to Plaintiffs and other consumers in the manner they designed, manufactured, tested, and marketed AndroGel, particularly in that they suppressed or failed to disclose AndroGel's risk of causing heart attacks, strokes, and death.

172.     Defendants knew or should have known of AndroGel's tendency to induce heart attack, stroke, and/or death, and as such its breaches were wanton and willful, revealing Defendants' blatant, callous, and indifferent conduct towards Plaintiffs and the public in general.

173.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff needlessly suffered injuries and continues to endure the extensive harm the injuries caused him, including permanent, ongoing, and profound damage, and a higher risk of death.

## Count Five – Breach of Implied Warranty

174.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

175.     Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to him, his agents, and his physicians that AndroGel was of merchantable quality, safe, and fit for intended use.

176.     Plaintiff is and was relatively unskilled with respect to research, design, and manufacture of drugs, including AndroGel and/or testosterone cypionate, and he reasonably relied

entirely on the skill, judgment, and implied warranty of the Defendants in using Defendants' product.

177.     But AndroGel was neither safe for its intended use nor of merchantable quality, despite Defendants' warranty; on the contrary, it is beyond dispute that AndroGel and medicines like it have dangerous propensities even when used as intended and will in fact cause severe injuries to many users.

178.     As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## Count Six – Breach of Express Warranty

179.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

180.     At all times mentioned, Defendants expressly represented and warranted to Plaintiff, his physicians, and his agents, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, including package inserts and other written materials intended for physicians, medical patients, and the general public, that AndroGel is safe, effective, and fit for its intended use.

181.     Plaintiff purchased AndroGel relying upon these warranties.

182.     In utilizing AndroGel and testosterone cypionate, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants.

183.     These warranties and representations were false; AndroGel is unsafe and unfit for its intended uses.

184.     As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

**<u>Count Seven – Fraud</u>**

185.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

186.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed AndroGel, and up to and including the present, willfully deceived Plaintiff by concealing from him, his physicians, and the public in general the true facts concerning AndroGel, which of course the Defendants had a duty to disclose.

187.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel, purposefully deceiving Plaintiff, his physicians, and the public as to the health risks and consequences of using AndroGel.

188.     Defendants have always known that AndroGel is not safe and fit for human use, and that AndroGel has a remarkably strong propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiffs suffered.

189.     Defendants, with the intent to defraud Plaintiffs, actively concealed and suppressed facts concerning AndroGel, in that Defendants knew that a reasonable doctor would not prescribe AndroGel, and that a reasonable patient would not use AndroGel, if the patient and doctor were made aware of the true nature of the dangerous drug.

190.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

**<u>Count Eight – Negligent Misrepresentation</u>**

191.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

192.     From the time AndroGel was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to and including the present, Defendants made misrepresentations to Plaintiff, his physicians, and the general public, including but not limited to the misrepresentation that AndroGel was safe, fit, and effective for human consumption.

193.     At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel and willfully deceive Plaintiff, his physicians, and the general public as to the health risks and consequences of the use of AndroGel.

194.     Moreover, the Defendants made the foregoing representations without any reasonable ground for believing them to be true.

195.     These representations were made directly by Defendants, their sales representatives, and other authorized agents, in publications and other written materials directed to physicians, patients, and the public, with the intention of inducing reliance and the purchase and use of AndroGel.

196.     The representations by the Defendants were in fact false, in that AndroGel was not safe, fit, and effective for human consumption, using AndroGel is hazardous to health, and AndroGel has a strong propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

197.     The foregoing representations offered by Defendants were made with the intention of inducing reliance, so that doctors would prescribe AndroGel and so that patients would use it having no indication of the devastating side effects.

198.     In reliance on the misrepresentations made by the Defendants collectively and individually, Plaintiff was induced to purchase and use AndroGel and testosterone cypionate.

199.    If Plaintiff had known the truth—that Defendants were hiding the fact that AndroGel has a propensity to ruin lives—he would not have used AndroGel.

200.    Plaintiff's reliance upon Defendants' misrepresentations was justified because the Defendants were the only individuals and entities with actual knowledge of the facts.

201.    As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## Count Nine – Intentional Infliction of Emotional Distress

202.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

203.    In ignoring and failing to disclose AndroGel's risk of causing heart attacks, strokes, and even death, Defendants acted in an extreme and outrageous manner.

204.    Defendants should have known and/or did know that their conduct could cause and would cause emotional distress to men who took AndroGel and suffered an injury, and to the wives and families of those men.

205.    AndroGel's dangers caused a risk of illness and bodily harm to Plaintiff and actually did cause illness and bodily harm to him.

206.    Defendants intentionally caused, or recklessly disregarded the risks of causing, the emotional distress associated with suffering multiple adverse thrombotic and/or cardiac events or even death.

207.    Plaintiff has suffered severe emotional distress from discovering that his injuries were preventable, that the injuries were in fact caused by AndroGel, and that his injuries caused extensive damage, including permanent, ongoing, and profound injury to his brain, a higher risk for a variety of future complications, and a higher risk of death.

41

208.     Defendants' outrageous conduct in not disclosing AndroGel's risks are the actual and proximate cause of Plaintiff's distress.

209.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff has suffered and continues to suffer emotional distress.

## Count Ten – Negligence Infliction of Emotional Distress

210.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

211.     Defendants owed a duty to act with reasonable care in the designing, manufacturing, and marketing/labeling of AndroGel.

212.     Defendants breached their duties by releasing to the public a product that was inherently dangerous and by not warning anyone of the product's dangerous propensities.

213.     Defendants should have known and/or did know that their conduct could cause and would cause emotional distress to people who took AndroGel and suffered injury.

214.     AndroGel's dangers caused a risk of illness and bodily harm to Plaintiff and actually did cause illness and bodily harm to Plaintiff.

215.     Defendants' breaches caused Plaintiff's injuries, which were a direct and proximate cause of the lifelong damage that resulted, including persistent severe emotional distress.

## Punitive Damages Allegations

216.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

42

217.      The acts and omissions of Defendants, as alleged throughout this Complaint, were willful, malicious, and cruel.

218.      Defendants committed these acts with a conscious disregard for the rights of Plaintiff, other AndroGel users, and their families.

219.      The primary purpose of Defendants' acts and omissions were increasing profits from the sale and distribution of AndroGel —no matter the human cost.

220.      Defendants' wanton, appalling, and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish Defendants and to prevent this behavior from occurring again.

221.      Prior to the manufacturing, sale, and distribution of AndroGel, Defendants knew that AndroGel was in a defective condition (as previously described herein) and knew that those who were prescribed the medication—as well as their families— would experience and did experience severe physical, mental, and emotional injuries.

222.      Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff, and as such, Defendants callously subjected consumers of AndroGel to risk of life-threatening injury or death.

223.      Defendants, acting through its officers, directors, and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in AndroGel and failed to warn the public, including Plaintiffs, and physicians of the extreme risk of injury occasioned by those defects present in AndroGel.

224.      Additionally, Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution, and marketing of AndroGel,

despite knowing their actions would expose persons to serious danger, in order to advance Defendants' pecuniary interest.

225.    Defendants' conduct was so contemptible and abhorrent as to be despised and met with disapproval by people of ordinary decency, and was continued by Defendants with willful and conscious disregard for the safety of Plaintiff and the wellbeing of his family, entitling Plaintiff to exemplary damages.

### Prayer for Relief

WHEREFORE, Plaintiff prays for judgment against the Defendants, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff:

A.    General damages in an amount that will conform to proof at time of trial;

B.    Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.    Loss of earnings and impaired earnings capacity accordingly to proof at the time of trial;

D.    Medical expense, past and future, according to proof at the time of trial;

E.    For past and future mental and emotional distress, according to proof;

F.    Damages for loss of care, comfort, society, and companionship in an amount within the jurisdiction of this Court and according to proof;

G.    For punitive or exemplary damages according to proof;

H.    Restitution, disgorgement of profits, and other equitable relief;

I.    Injunctive relief;

J.    Attorney's fees;

K.    For costs of suit incurred in litigating this action;

L.      For pre-judgment interest as provided by law; and

M.      For such other and further relief as the Court may deem just and proper.

### **Demand for Jury Trial**

Plaintiff hereby demands a jury trial on all claims so triable in this action.

Dated:   January 26, 2015

Respectfully Submitted,

BY: <u>/s/ *David M. Peterson*</u>

David M. Peterson, Esq.
Nicholas Clevenger, Esq.
Brian Tadtman, Esq.
**Peterson & Associates, P.C.**
801 W. 47th Street, Ste. 107
Kansas City, MO 64112
(816) 529-3476  Telephone
(816) 531-0660  Fax
dmp@petersonlawfirm.com
nsc@petersonlawfirm.com
bet@petersonlawfirm.com

*ATTORNEYS FOR PLAINTIFF*